# UNITED STATES DISTRICT COURT

for the

District of __New Mexico__

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 0 4 2015

MATTHEW J. DYKMAN
CLERK

In the Matter of the Seizure of  )
*(Briefly describe the property to be seized)*  )
J.P. Morgan Chase Bank  )   Case No.
Account #587561791  )
  )   15 mr 342
  )

## APPLICATION FOR A WARRANT
## TO SEIZE PERSONAL PROPERTY SUBJECT TO CIVIL FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of __New Mexico__ is subject to forfeiture to the United States of America under __21__ U.S.C. § __881 and 853__ *(describe property)*:

J.P. Morgan Chase Bank Account #587561791

The application is based on these facts:

see attached affidavit

☐ Continued on the attached sheet.

_____
Applicant's Signature

Brian Bridgeford, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06-04-2015

_____
Judge's signature

Karen B. Molzen, Chief Magistrate Judge
*Printed name and title*

City and state: Albuquerque, New Mexico

UNITED STATES DISTRICT COURT
THE DISTRICT OF NEW MEXICO

In the Matter of the Seizure of:

SEE ATTACHMENT "A"

APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT

CASE NUMBER:

I, Brian Bridgeford, being duly sworn depose and say:

I am a Special Agent with the United States Drug Enforcement Administration and have reason to believe that in the District of New Mexico there is now concealed a certain property, namely:

THE CASH VALUE OF THE CONTENTS OF ACCOUNT NUMBERS LISTED IN ATTACHMENT "A" INCLUDING ALL FUNDS, CURRENCY, MONIES AND MONETARY INSTRUMENTS AS DEFINED BY 18 U.S.C. § 1956(C)(5), PRESENTLY CONTAINED THEREIN HELD IN THE NAME(S) AND BANK LOCATIONS FULLY DESCRIBED IN ATTACHMENT "A"

which are traceable proceeds of knowingly Distributing and Possessing with Intent to Distribute a Controlled Substance, in violation of 21 USC § 841(a)(1), and are subject to seizure and forfeiture under 21 U.S.C. §§ 853(a)(1) and (a)(2), 853(f), and 881(a)(6).

The facts to support a finding of probable cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT

_____
Signature of Affiant

Continued on the attached sheet and made a part hereof.   X  Yes   __ No

Sworn to before me, and subscribed in my presence

June 4, 2015
Date

Albuquerque, New Mexico
City and State

Karen B. Molzen, U.S. Chief Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT

I, Brian Bridgeford, having been first duly sworn, depose and say:

I have been employed by the United States Department of Justice, Drug Enforcement Administration (DEA) since March 2010. Prior to employment with the DEA, I was employed as a police officer and narcotics investigator for the Sanford Police Department in Sanford, Florida. During this time I have accumulated the following training and experience:

(a) I graduated from the DEA Academy (Quantico, Virginia). I received approximately 19 weeks of specialized narcotics related training. The training included controlled substance identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical applications of narcotics enforcement, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects including latent fingerprint collection and analysis.

(b) As a narcotics investigator and DEA agent, I have participated in investigations targeting individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine, synthetic cathinones ("bath salts"), synthetic cannabinoids ("spice"), and other controlled substances as defined in Title 21, USC, Section 801.

## PROPERTY TO BE SEIZED

1. This affidavit is made in support of an application for a seizure warrant for the following bank accounts:

   Held at J.P. Morgan Chase Bank:

   a. Business account 587561791 **(Target Account 1)**, held in the name of DR WHOLESALE, and the signers are Daniel BOWLES and Ratchanee MCAULEY;

   b. Business account 215899983 **(Target Account 2)**, held in the name of DESERT HILLS WHOLESALE, and the signer is Chuanphit SRITHONGRUNG;

1

Held at BMO Harris Bank:

   a. Business account 4816255877 **(Target Account 3)**, held in the name of DRS ENTERPRISES;

Held at First Bank:

   a. Business account ending in 7674 **(Target Account 4)**, held in the name of DRS ENTERPRISES;

Held at U.S. Bank:

   a. Business account 153153447740 **(Target Account 5)**, held in the name of TB WHOLESALE, and the signer is Todd BOWLES;

Held at Mountain America Credit Union:

   a. Business account 9547272 **(Target Account 6)**, held in the name of KNOCKOUT WHOLESALE, and the signer is Ranae THOMPSON.

2. There is probable cause to believe that the funds in said bank accounts were used to facilitate illegal drug trafficking or represent funds derived from or comingled with proceeds traceable to violations of 21 U.S.C. §§ 841(a)(1) and 846. As such, the funds in the bank accounts are subject to criminal seizure and forfeiture pursuant to Title 21 USC §§ 853 (a)(1) and (a)(2), 853 (f), and civil seizure and forfeiture pursuant to Title 21 UCS § 881(a)(6).

3. There is probable cause to believe that the funds in the aforementioned bank accounts were obtained by the BOWLES drug trafficking organization (DTO) through proceeds derived from the manufacture and distribution of synthetic cannabinoids, commonly known as "spice," which is comprised of Schedule I controlled substances and/or analogues of Schedule I controlled substances. There is also probable cause to believe that the proceeds of the scheme were laundered through financial transactions whereby the BOWLES DTO deposited, transferred, and withdrew the money, obtained from such illegal sales, to and from their various business and personal accounts.

4. Since this Affidavit is being submitted for the limited purpose of securing a Seizure Warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the search and seizure of the bank accounts described above.

### BACKGROUND ON SYNTHETIC CANNABINOIDS

5. My training and experience has shown that in recent years, individuals have begun to manufacture and traffic in synthetic cannabinoid products, many times referred to as "spice," "incense," and/or "potpourri." These synthetic cannabinoids are often ingested through inhalation. Smoke-able synthetic cannabinoid products can be a mixture of an organic "carrier" medium, such as the herb-like substance Damiana, which is then typically sprayed or mixed with the synthetic cannabinoid. Synthetic cannabinoids typically have hallucinogenic effects that are similar to THC (tetrahydrocannabinol), the psychoactive ingredient in marijuana. Currently, there are numerous synthetic cannabinoid compounds.

6. The five most common compounds during the emergence of "spice" were JWH-018; JWH-073; JWH-200; CP-47, 497 C8 homologue; and 47, 497 cannabicyclohexanol, which were "emergency scheduled" by the DEA in March 2011 as Schedule I Controlled Substances. On July 9, 2012, the DEA emergency scheduled numerous additional substances as Schedule I substances under the Controlled Substances Act. The following substances were included in that scheduling: AM-2201, AM-694, JWH-019, JWH-203, JWH-250, JWH-398, JWH-081, JWH-122. On May 16, 2013, the DEA emergency scheduled three additional substances under the Controlled Substances Act, UR-144, XLR11, and AKB48. On February 10, 2014, the DEA emergency scheduled four additional substances under the Controlled Substances Act, PB-22, 5-Flouro-PB-22, AB-FUBINACA, and ADB-PINACA. On January 30, 2015, the DEA emergency scheduled AB-PINACA, AB-CHMINACA, and THJ-2201 under the Controlled Substances Act. In response to each scheduling, clandestine

manufacturers and traffickers began distributing smoke-able synthetic cannabinoid products containing slightly varied synthetic cannabinoid compounds in an attempt to circumvent newly enacted federal and state laws.  Smoke-able synthetic cannabinoid products are commonly purchased in head shops, tobacco shops, convenience stores, and over the internet.  They are often marketed as incense or potpourri, and almost always carry the markings "not for human consumption" and/or "DEA Compliant." These markings are routinely in place in an attempt to circumvent the product being identified as a controlled substance analogue of the newly scheduled controlled substances.  Users of these products have reported effects similar to THC, including, but not limited to, paranoia, panic attacks, increased heart rate, increased blood pressure, and even death.  Through training and experience, as referenced earlier, I know these substances to be considered hallucinogens that affect the human body in a similar way to THC through the body's central nervous system.

7. Through training and experience, I know that individuals, in an attempt to circumvent laws making the possession and distribution of certain synthetic drugs illegal, purchase or produce substances which have a slightly different chemical structure, but that will produce the same pharmacological effect on the human body when ingested. In response, Congress enacted the Controlled Substance Analogue Enforcement Act of 1986.  This law provides for controlled substance analogues, to the extent that they are intended for human consumption, to be treated as Schedule I controlled substances for the purposes of criminal prosecution.  The term "controlled substance analogue" means a substance: (1) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; (2) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (3) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled

4

substance in schedule I or II. I am aware that DEA has identified numerous substances that meet the definition of controlled substance analogues found in 21 U.S.C. § 802(32), and when intended for human consumption, they are treated as Schedule I controlled substances under Title 21 of the United States Code (21 U.S.C. § 813).

8. In addition, I am now aware of a new emerging market in which products are distributed under the name "CBD," which stands for cannabidiol. I have seen these products be sold in both liquid form and in the form of a dissolving strip that the user must place between their gum and cheek. The use of these products is intended to provide the user with a marijuana like "high," and laboratory results have revealed that some of these products contain THC (tetrahydrocannabinol), a Schedule I controlled substance.

## PROBABLE CAUSE

9. I have been investigating the Daniel BOWLES DTO since approximately May 2013, which manufactures and distributes synthetic cannabinoids nationwide. Specifically, I have traced cashier's checks, business checks, and personal checks to companies and persons responsible for supplying several smoke shops in New Mexico, and nationwide, with synthetic cannabinoids, including PLANET X WHOLESALE, XTREME WHOLESALE, HORIZON WHOLESALE, PIRATE WHOLESALE, DIAMOND WHOLESALE, TB WHOLESALE, JK WHOLESALE, FAST TRACK WHOLESALE, KNOCKOUT WHOLESALE, WISE GUY LLC, DD DISTRIBUTION, DR WHOLESALE, DRS ENTERPRISES, and DESERT HILLS WHOLESALE. Persons responsible for these accounts and associated with the DTO include Daniel BOWLES, Sureerat COX, Thirawat ATHIKULRAT, Chuanphit SRITHONGRUNG, Timothy JENSON, Don JESSOP, Samuel SMITH, David FELLER, Ratchanee MCAULEY BOWLES, Todd BOWLES, Janell THOMPSON BOWLES, Ranae BOWLES THOMPSON, and Stan THOMPSON. Most recently, during my investigation in to the synthetic cannabinoid distribution by the DELAWYER DTO, which owns and operates three smoke shops located in New

Mexico and Texas, I discovered several financial transactions which I believe are related to the purchase of wholesale quantities of synthetic cannabinoids from the BOWLES DTO.

10. As a part of this current investigation, on November 19, 2014, while acting in an undercover capacity, I purchased suspected synthetic cannabinoids from UP IN SMOKE, located at 220 E Marland Street, Hobbs, New Mexico. This is one of the locations owned/operated by the DELAWYER family. The purchased exhibits, termed "Black Voodoo" and "Ripped," were confirmed by the DEA South Central Laboratory to contain an analogue of a Schedule I controlled substance, namely AB-CHMINACA.

11. On January 6, 2015, while acting in an undercover capacity, I again purchased suspected synthetic cannabinoids from UP IN SMOKE, located in Hobbs, New Mexico. The purchased exhibits, termed "Black Voodoo" and "F'd Up," were confirmed by the DEA South Central Laboratory to contain an analogue of a Schedule I controlled substance, namely AB-CHMINACA.

12. On April 15, 2015, while acting in an undercover capacity, I again purchased suspected synthetic cannabinoids from UP IN SMOKE, located in Hobbs, New Mexico. The purchased exhibits, termed "Cheap Trip" and "Dr. Feelgood," were confirmed by the DEA South Central Laboratory to contain an analogue of a Schedule I controlled substance, namely 5F-AMB.

13. The brand names of these purchases are significant as the products are directly associated with the BOWLES DTO. Based upon my entire investigation, which I previously stated began in 2013, I know that the BOWLES DTO has distributed "Black Voodoo," "Cheap Trip," "Dr. Feelgood," and "F'd Up" to other smoke shop owners in New Mexico.

14. Also on April 15, 2015, while acting in an undercover capacity, I purchased suspected synthetic cannabinoids and a "CBD Strip" from JUST SMOKES, located in Lubbock, Texas. The purchased synthetic cannabinoid products, packaged in tin cans with labels that stated "Packaged by Just Smokes in Lubbock, Texas," were termed "Island Breeze" and "Island Flower." Both products were confirmed by the DEA South Central Laboratory to contain an analogue of a Schedule I controlled substance, namely 5F-AMB. It is believed that the DELAWYER DTO purchased unpackaged bulk synthetic cannabinoid from the BOWLES DTO and packaged the product in their own containers. At the time these exhibits were submitted to the lab, the forensic chemist who analyzed them, along with the exhibits from UP IN SMOKE, stated it was the first time he had seen the chemical 5F-AMB, indicating the possibility for the same source of all the products.

15. The "CBD Strip" that was purchased on the same date was confirmed by the DEA South Central Laboratory to contain Delta-9 Tetrahydrocannabinol, or THC, a Schedule I controlled substance. When purchasing the exhibits at JUST SMOKES I observed a flyer advertising the "CBD Strip" as being a product of "DRS Enterprises," a business entity associated with Daniel BOWLES.

16. While conducting a financial review of the accounts associated with the DELAWYER DTO, I noticed that on November 10, 2014, two separate cashier's checks in the amounts of $16,500 and $24,750 were made payable to "DR WHOLESALE," with a listed remitter of JUST SMOKES. Both checks were deposited in to **Target Account 1**.

17. On November 19, 2014, a cashier's check in the amount of $4,950 was made payable to "DR. WHOLESALE," with a listed remitter of DELAWYER-TX, LLC, a business entity associated with JUST SMOKES and the DELAWYER DTO. The check was deposited in to **Target Account 1**.

18. On January 28, 2015, a cashier's check in the amount of $17,034 was made payable to "DR. WHOLESALE," with a listed remitter of UP IN SMOKE. The check was deposited in to **Target Account 1**.

19. On February 11, 2015, two separate cashier's checks in the amounts of $10,000 and $3,400 were made payable to "DRS ENTERPRISES," with a listed remitter of UP IN SMOKE. The checks were deposited in to **Target Account 4**.

20. On March 11, 2015, four separate cashier's checks in the amounts of $10,000, $10,000, $10,000 and $6,495 were made payable to "DRS ENTERPRISES," with a listed remitter of UP IN SMOKE. Two of the checks were deposited in to **Target Account 3** and two of the checks were deposited in to **Target Account 4**.

21. On April 1, 2015, four separate cashier's checks in the amounts of $10,000, $7,938, $5,286, and $5,876 were made payable to "DESERTHILLS WHOLESALE," with a listed remitter of UP IN SMOKE. All of the checks were deposited in to **Target Account 2**.

22. On April 15, 2015, three separate cashier's checks in the amounts of $4,675, $10,000, and $10,000 were made payable to "DESERTHILLS WHOLESALE," with a listed remitter of UP IN SMOKE. All of the checks were deposited in to **Target Account 2**.

23. On April 29, 2015, three separate cashier's checks in the amounts of $4,675, $10,000, and $10,000 were made payable to "DESERTHILLS WHOLESALE," with a listed remitter of UP IN SMOKE. All of the checks were deposited in to **Target Account 2**.

24. Based upon my investigation, I believe that all of these transactions were payments for wholesale quantities of synthetic cannabinoids and the CBD products which tested

8

positive for the presence of Schedule I controlled substances and/or controlled substance analogues.

25. While conducting a financial review of the accounts associated with the BOWLES DTO, I noticed that on February 3, 2015, **Target Account 1** issued a check in the amount of $16,182 to "TB Wholesale," with "Sales till 1/31/15" written in the memo section. This check was deposited in to **Target Account 5**. On February 11, 2015, **Target Account 5** issued a check in the amount of $13,621 to "Knockout Wholesale." This check was deposited in to **Target Account 6**.

26. On March 18, 2015, **Target Account 2** issued a check in the amount of $15,588 to "TB Wholesale," with "comm." written in the memo line. It is believed that "comm." represents "commission." This check was deposited in to **Target Account 5**. On March 20, 2015, **Target Account 5** issued a check in the amount of $7,794 to "Knockout Wholesale," with "comm." written in the memo section. This check was deposited in to **Target Account 6**.

27. Based upon my knowledge of this investigation, the money in these transactions between Daniel BOWLES, Todd BOWLES, and Ranae BOWLES THOMPSON are believed to be proceeds of illicit sales that are being laundered through financial transactions whereby the subjects deposited, transferred, and withdrew the money.

28. Based upon my investigation, I believe that the funds in **Target Account 1** through **Target Account 6** are used to facilitate illegal drug trafficking or represent funds derived or comingled from proceeds traceable to violations of 21 U.S.C. §§ 841(a)(1) and 846.

29. Therefore, I request that the Court issue a Seizure Warrant as authorized under Title 21, United States Code, Section 881(b) and 853(a)(1) and (a)(2). I request this warrant be issued in lieu of a restraining order as required by Title 21 U.S.C. § 853(f), as an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability

of the funds for forfeiture because: the accounts contain tangible proceeds which are subject to rapid dissipation and the defendants/owners or their designees cannot reasonably be relied upon to abide by an order to maintain the property.

30. I further request that a seizure warrant direct the above listed financial institutions at which the Target Account is maintained to do the following:

- freeze the contents of the account in place and to refuse the withdrawal of any amount from the account by anyone other than the United States Drug Enforcement Administration (DEA), and

- while any contents of the account are frozen in place to accrue deposits, interest, and dividends, until DEA directs that the contents of the account be finally liquidated and no contents remain.

Freezing the contents could occur in the event the bank is unable to provide the funds immediately to the DEA and therefore restricts the removal and/or dissipation of the funds by the account holder(s.)

I declare under the penalty of perjury that this information is true and correct to the best of my knowledge.

_____
Brian Bridgeford
Special Agent
U.S. Drug Enforcement Administration

*Reviewed and approved by Steve Kotz, Assistant United States Attorney, District of New Mexico.

Subscribed and sworn to before me this ___4th___ day of June, 2015.

_____
The Honorable Karen B. Molzen
United States Chief Magistrate Judge

## Attachment "A"

I request that a seizure warrant direct the listed financial institutions at which the Target Account is maintained to do the following:

- freeze the contents of the account in place and to refuse the withdrawal of any amount from the account by anyone other than the United States Drug Enforcement Administration (DEA), and

- while any contents of the account are frozen in place to accrue deposits, interest, and dividends, until DEA directs that the contents of the account be finally liquidated and no contents remain.

## TARGET ACCOUNTS

a. J.P. Morgan Chase Bank account 587561791 **(Target Account 1)**, held in the name of DR WHOLESALE;

b. J.P. Morgan Chase Bank account 215899983 **(Target Account 2)**, held in the name of DESERT HILLS WHOLESALE;

c. BMO Harris Bank account 4816255877 **(Target Account 3)**, held in the name of DRS ENTERPRISES;

d. First Bank account ending in 7674 **(Target Account 4)**, held in the name of DRS ENTERPRISES;

e. U.S. Bank account 153153447740 **(Target Account 5)**, held in the name of TB WHOLESALE;

f. Mountain America Credit Union account 9547272 **(Target Account 6)**, held in the name of KNOCKOUT WHOLESALE.